**GREENBERG TRAURIG, LLP**
George M. Belfield (SBN 100272)
Email: *belfieldg@gtlaw.com*
Nina D. Boyajian (SBN 246415)
Email: *boyajiann@gtlaw.com*
Alana C. Srour (SBN 271905)
Email: *sroura@gtlaw.com*
2450 Colorado Avenue, Suite 400 East
Santa Monica, CA 90404-5524
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Attorneys for Defendants
MADONNA LOUISE VERONICA CICCONE;
MG ICON, LLC; MACY'S RETAIL
HOLDINGS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| L.A. TRIUMPH, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MADONNA LOUISE VERONICA CICCONE, an individual; MATERIAL GIRL BRAND, LLC, a Delaware limited liability company; MG ICON, a Delaware limited liability company; MACY'S RETAIL HOLDINGS, INC., a Delaware corporation; and DOES 1 through 10,<br><br>Defendants. | CASE NO. CV 10-6195 SJO (JCx)<br><br>**DECLARATION OF NINA D. BOYAJIAN IN SUPPORT OF MOTION IN LIMINE NO. 4 TO EXCLUDE EXPERT TESTIMONY OF ANTONIO R. SARABIA II, A "BUSINESS PERSON AND ATTORNEY"**<br><br>Date: October 11, 2011<br>Place: Courtroom 1<br>Pre-Trial Conference: October 3, 2011<br>Trial Date: October 11, 2011<br><br>[Concurrently Filed With: (1) Motion in Limine; (2) [Proposed] Order]<br><br>Honorable S. James Otero |

## DECLARATION OF NINA D. BOYAJIAN

I, Nina D. Boyajian, declare as follows:

1.     I am an associate with the law firm of Greenberg Traurig, LLP, counsel for defendants MG Icon LLC and Macy's Retail Holdings, Inc. in this action.  I am licensed to practice law in the State of California and before this Court.  As such, I have personal knowledge of the facts set forth in this Declaration and, if called and sworn as a witness, I could and would testify competently with respect thereto.  I submit this declaration in support of Defendants' Motion in Limine to Exclude Expert Testimony of Antonio R. Sarabia II, a "Business Person and Attorney" ("Motion").

2.     On July 13, 2011, plaintiff served two "expert" reports, including the report of Antonio R. Sarabia II ("Sarabia Report").  The following day, plaintiff filed the Sarabia Report with the Court as an attachment to the declaration of plaintiff's attorney, purportedly "in support of plaintiff's opposition" to defendants' Motion for Summary Judgment or Summary Adjudication of Issues.

3.     Following plaintiff's filing, the parties met and conferred and stipulated that the Clerk remove from the public record the declaration attaching the Sarabia Report, which contained confidential trade secret information, and replace it with an amended declaration attaching a redacted version of the Sarabia Report.  The parties also agreed that by stipulating to the filing of the amended declaration and redacted Sarabia Report, defendants did not waive any additional objections to the Sarabia Report, nor any future claims that the filing of Document No. 99 violated the terms of the Amended Protective Order.

4.     On July 20, 2011, the Court granted the parties' stipulation regarding removing the Sarabia Report from the public record and replacing it with a redacted version of the report ("Redacted Sarabia Report") (Document No. 104).

5.     Attached hereto as Exhibit A is a true and correct copy of the Redacted Sarabia Report.  (Document No. 99).

6.     Pursuant to this Court's Initial Standing Order Paragraph 24(a)(b)(6)(b),

1

some of the issues raised in this motion were also raised in Defendants' *Ex Parte* Application For Order To Strike Declaration of Christopher W. Arledge Re Expert Report In Support Of Plaintiff's Opposition To Defendants' Motion For Summary Judgment Or Summary Adjudication Of Issues And Supporting Documents (Document No. 102).

7.      Attached hereto as Exhibit B are true and correct copies of excerpts from the deposition of Antonio R. Sarabia II.

8.      This Motion is made after the Local Rule 7-2 meeting of counsel which took place on August 24, 2011.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed at Santa Monica, California on September 6, 2011.

                                              */s/ Nina D. Boyajian*
                                              NINA D. BOYAJIAN

2

# EXHIBIT A

# Report of Antonio R. Sarabia II

On Behalf of Plaintiff LA Triumph, Inc.

LA Triumph, Inc. v. MG Icon, Inc. et. al

# Table of Contents

<u>Section</u>                                                                                        <u>Page</u>

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Summary of Main Opinions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3. Purim Did Not Have Any Trademark Rights in "Material Girl"  . . . . . . . . . . . 5

4. Purim Failed to Provide "Material Girl" Trademark Rights
   to MG Icon  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5. The License of "Material Girl" Between Purim and Mg Icon
   Is a Naked License Because Purim Fails to Exercise Quality
   Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6. Apparel Branding Is Very Important to Retail Stores
   Such as Macys' . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7. L.A. Triumph (and its Predecessors) Have Sold
   "Material Girl" Apparel in the Same Segment of the
   Apparel Market in Which Macys' Sells Apparel . . . . . . . . . . . . . . . . . . . . . . 12

8. Concert Related Apparel Is in a Different Segment
   of the Apparel Market than Apparel Sold in Department
   and Specialty Stores  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

9. The Documents Provided by Live Nation, Winterland
   and Signatures Are Not Reliable Sources of Information
   about the Use of the "Material Girl" Trademark  . . . . . . . . . . . . . . . . . . . . 15

10. Business Bases of Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Exhibit A - Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

Exhibit B - List of Publications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Exhibit C - List of Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Exhbit D - Photos of "Material Girl" Apparel . . . . . . . . . . . . . . . . . . . . . . . 26

ii

# Introduction

This case is dispute over trademark rights to "Material Girl."  Plaintiff L.A. Triumph claims superior rights to use this trademark on apparel based on the sales and marketing it and its predecessors have done. L.A. Triumph sued defendants MG Icon and Macys' seeking  a declaration of rights and trademark infringement remedies.  MG Icon and Macys' claim that their trademark rights to use "Material Girl" on clothing come from performer Madonna and predate the rights of L.A. Triumph. MG Icon obtained its trademark rights through a license from Purim.  In turn, MG Icon licensed Macys' to use the "Material Girl" on apparel. This report will focus on some licensing and apparel business issues.

## 1. Qualifications

For twenty-five years I have worked in the apparel sportswear (casual clothing) business as a business person and attorney.  For nine years I was employed full time by a leading sportswear company, Guess?, Inc.  During my employment at Guess, I constantly participated in and made management decisions about brand and design development and protection involving: (a) which designs and marks were original and protectable; (b) registration of copyrights and trademarks; and (c) the enforcement of legal rights to brands and designs.  I worked closely and frequently with the design, advertising, retail store  and financial departments. With each of these departments I was involved with

policies, contracts and management decisions.  I regularly saw how apparel and fabric

designs were inspired  and created. I coordinated with the advertising department to

protect its creations. I was frequently in apparel factories so that I became familiar with

the manufacturing of garments from the ordering of component parts, such as fabric and

trim (labels, buttons and rivets), through fabric cutting, garment assembly, final garment

preparation (such as removing loose threads), packaging, and shipping.


Since 1984 I have specialized in the evaluation and development of copyright and

trademark portfolios for apparel and sportswear companies.  I create worldwide trademark

plans for companies.  I have managed trademark portfolios with thousands of marks.  I

advise apparel companies on whether new designs for fabric prints, labels, tags and

decorative stitching are sufficiently different from their sources of inspiration to be original.

I have met with individual designers and conducted seminars for design departments on

originality.  I have worked closely with prominent apparel designers.


My intellectual property work has encompassed large companies (Nike, Guess,

Gymboree, Dooney & Bourke and Microsoft)  and young companies in their early growth

stages such as jeans company Earl Jean.


During the last twenty-five years, I have continuously worked in trademark

licensing, often involving apparel. I have participated in thousands of licensing

negotiations, culminating in dozens of licenses. This participation included negotiation of

E:\EXP\reportlatriumph7/13/11                              2

all of the business points of the licenses. I have chosen licensees from among many candidates. I selected the countries and products into which the licensing of a brand should be expanded. I was vice-president of the licensing department of an apparel company the licensing revenues of which were in the millions of dollars. I have worked with and negotiated numerous distribution and licensing agreements in Asia and Latin America including those involving Brazil, Argentina and Panama, among other countries. I have traveled to and inspected licensee operations abroad. I have reviewed licensee and distributor performance.  I regularly advise clients about licensing as a means to expand and develop a brand.

Both my licensing and apparel work included involvement with retail stores as part of a branding strategy.  This work included determining which trademarks should be used in retail stores, how they should be displayed and what type of retail stores were appropriate for a particular branding strategy. I visited licensee stores.

I was retained as a licensing expert by the Vatican.

Exhibit A is my resume.  Exhibit B lists my publications in the last ten years, my compensation and other cases in which I have given expert testimony in the last four years.  Exhibit C is a list of sources used.  I also relied on my knowledge of the apparel and licensing businesses from my twenty-five years of work in these businesses. Exhibits D are pictures of "Material Girl" apparel. I may supplement my opinions, analysis or

exhibits after I review additional information.  If this case goes to trial, I may use the exhibits in a larger or different (such as projection) format, as well as excerpts of any part of this report in a larger or different format suitable to a courtroom.

**2.      Summary of Main Opinions**

I am providing opinions that:

A.      Purim did not have any trademark rights in "Material Girl."

B.      Licensor Purim did not provide trademark rights in "Material Girl" to licensee MG Icon.

C.      The license of "Material Girl" between Purim and MG Icon is a naked license.

D.      Apparel branding is very important to retail stores such as Macys'.

E.      L.A. Triumph (and its predecessors) have sold apparel with the "Material Girl" mark in the same segment of the apparel market in which Macys' sells apparel.

F.      Concert related apparel is in a different segment of the apparel market than apparel sold in department and specialty stores.

G.      The documents provided by Live Nation, Winterland and Signatures are not reliable sources of information about the use of the "Material Girl" trademark.

**3.      Purim Did Not Have Any Trademark Rights in "Material Girl"**

Under the concert promotion agreements, trademark rights to marks used in Madonna's concerts went to her companies Boy Toy or Bhakti Touring (depending on the tour).[1] Assuming "Material Girl" was used on apparel in these concerts, those two entities would have ownership of the trademark. But it was Purim, another company, which granted a "Material Girl" license to MG Icon. How did Purim obtain those rights? Purim never received an assignment or license of trademark rights to "Material Girl" from Boy Toy or Bhakti Touring. Nor did Madonna.

Even assuming Madonna acquired some trademark interest in "Material Girl," she never made a written assignment or written license of rights to Purim.[2] There is also no

---

[1] Documents LN00001 - LN000219, e.g., Sony Signatures Agreement with Boy Toy §§9.1, 9.2, LN000021 - 2.

[2] Tarshis Dep. 77:20 - 24. Mr. Tarshis is the general counsel of Iconix, part owner of MG Icon.

oral assignment of rights to "Material Girl" to Purim.[3]  Purim, then, never had any rights to "Material Girl" to license to MG Icon.

### 4.      Purim Failed to Provide "Material Girl" Trademark Rights to MG Icon

Purim and MG Icon signed a license. In the recitals to the License Purim claims ownership of various rights, but does not claim ownership of trademark rights to "Material Girl." The  License takes care to define and explain the ownership of  "Licensed Rights,"[4] but that term does not include "Material Girl."  The grant of rights to "Material Girl" is in section 1.2(b).  That section grants MG Icon the right to use "Approved Terms."  That is a defined term (the definitions are at the end of the License)  which refers to Schedule C. "Material Girl" is the only term listed in Schedule C. In section 1.4(c), Purim retains the right to use "Material Girl" in connection with entertainment.

Nowhere in the License does it state that Purim owns the rights to "Material Girl" for use on apparel.  This is a very unusual license because of this omission.  It is the custom and practice in the trademark licensing business for the licensor to have an explicit statement of its rights to the mark being licensed.

---

[3] Tarshis Dep. 77:20 - 24; Oseary Dep. 98:25 - 99:6. Mr. Oseary has been Madonna's manager for more than 6 years.

[4] See Recital D and section 15.1(c) in which Purim asserts ownership of the Licensed Rights.

Section 1.2(a) states that Purim has not commercialized any marks, including the Approved Term  "Material Girl." In other words, Purim claims no right to the trademark "Material Girl" based on use. Viewing the license under trademark licensing business standards, Purim had no trademark interest in "Material Girl" to license.

Part of the trademark applications filed by MG Icon for "Material Girl" are consistent with this conclusion.  Those filings indicate that "Material Girl" has not been used. In other words, MG Icon has not acquired any rights to "Material Girl" based on use by itself or any predecessor.

5. **The License of "Material Girl" Between Purim and Mg Icon Is a Naked License Because Purim Fails to Exercise Quality Control**

Section 4 of the License contains the provisions which describe how approval is to be obtained.  Section 4.1 addresses approval of the Licensed Rights through an Operating Agreement. But "Material Girl" is not a Licensed Right. Section 4.2(a) requires licensor approval of any use of the Licensed Rights. Again, "Material Girl" is not a Licensed Right. The paragraph after section 4.2(e) and before section 5  provides that the licensee may use Designated Marks which do not include the Licensed Rights without approval. "Material Girl" may be a Designated Mark (one chosen to be used by the licensee). There is no requirement that MG Icon obtain approval of its use of "Material Girl." Under the standards of the licensing business, a license which allows use of a trademark without the

requirement of approval of the licensor may be a naked license.  A naked license gives the licensee unfettered use of the mark without quality control restrictions.

Inquiry about whether a license is a naked license does not stop with the license. One also looks to the conduct of the parties and other documentation. Some licensors with loose contracts may still run tight ships. This License requires that approvals be written (section 4.4). Although there is a provision for deemed approvals, that provision also requires written notice.[5]  It is possible that the licensor and licensee followed the written approval procedure with respect to uses of  "Material Girl," although it was not required by the License. However, MG Icon never made any written submissions to Purim about approval of a use of "Material Girl." [6]

Giving the license every benefit of the doubt and putting aside the written approval requirement, there is one other route to review of licensee uses of "Material Girl" by Purim. The MG Icon Operating Agreement provides that the Creative Manager may approve the use of marks by MG Icon.[7] Madonna is the Creative Manager.[8] But there is no information that she ever approved any use of "Material Girl" by MG Icon and there will not be such

---

[5] License §4.4(d)(ii); §16 requires all notices to be written.

[6] Request for Production (Third Set, no. 114, responded to by defendant MG Icon) asked for documents about approval of use of "Material Girl." There were no such documents.

[7] Operating Agreement  §5.05(b)(iii), p. 29.

[8] Tarshis Dep. 125:2 - 6.

information in this case.[9]

The practice - no quality control by licensor - matched the License which did not require approvals of the use of "Material Girl" on apparel. Under trademark licensing business standards, the License is a naked trademark license as to the mark "Material Girl."

One problem with a naked license is that a main purpose of trademarks is defeated. A main purpose of trademarks is to communicate to the public that it can expect and rely upon a trademark for a specific level of quality. But a naked license has no quality control and the public cannot rely upon the trademark being used under a naked license. This defeats the purpose of the trademark and puts consumers who attempt to rely upon the trademark at risk.

## 6.     Apparel Branding Is Very Important to Retail Stores Such as Macys'

The brands which retail stores sell are very important to the stores because, by selling a brand, the store gets the benefit of the good will which the brand has acquired. Goodwill includes the brand's reputation for a certain level of quality and the marketing which the brand has done to achieve recognition among consumers. A retail store benefits from the quality reputation by being able to give a guarantee (durability), quality

---

[9] 6/14/11 e-mail from Mr. Afrasiabi to Mr. Belfield.

assurance (well made) and established style to consumers. A retail store benefits from the marketing, or reputation, which a brand has because when it sells the brand and advertises, it is riding on the coattails of that reputation. A brand has built a certain level of recognition and the retail store receives the benefit of this by carrying the brand, without the cost of paying for the reputation.

Retail stores also use brands to attract desirable customers, customers accustomed to paying certain amounts for merchandise which are either consistent with the prices at that retailer or perhaps a little higher. These customers will then be in the store and may make other purchases.

These benefits of a brand allow a retailer to charge a higher price for branded goods than non-branded goods, which increases profits.

Macys' places a high value on brands and considers brands to be vital. "The Company is focused on four key strategies for continued growth in sales, earnings and cash flow in the years ahead: . . . (ii) developing private and exclusive brands . . ."[10] Macys' is particularly concerned about its ability to stay on top of fashion brands and trends:

---

[10] Macys' 2010 Annual Report, p. 16.

The Company's sales and operating results depend in part on its ability to predict or respond to changes in fashion trends and consumer preferences in a timely manner. . . . Any sustained failure to anticipate, identify and respond to emerging trends in lifestyle and consumer preferences could have a material adverse effect on the Company's business.[11]

The most important fashion brands to Macys' are in women's clothing. In each of the last three years women's clothing has comprised more than 25% of Macys' sales.[12]



It is important to keep in mind that these

---

[11] Macys' 2010 Annual Report, p. 7.

[12] Macys' 2010 Annual Report, p. 3.

[13]

payments are completely separate from, and in addition to, the cost of manufacturing, shipping, stocking, handling and selling "Material Girl" clothing.

## 7.    L.A. Triumph (and its Predecessors) Have Sold "Material Girl" Apparel in the Same Segment of the Apparel Market in Which Macys' Sells Apparel

There are a variety of levels of clothing sales venues in the U.S., with garage sales at one end and retailers like Prada at the other end. Macys' is, of course, a department store.  That places it above discount stores such as Target and Walmart and below luxury goods stores like Prada. Macys' is on a par with other department stores and specialty stores in malls. Macys' is often the anchor (largest) tenant at malls. One of the important distinguishing characteristics between segments of the retail apparel business is the brands that are carried by the various stores.  Walmart has different brands than Neiman Marcus. The level of service and the store environments are also different, with higher end stores having more personnel and nicer facilities.

Because many consumers are brand oriented, one way to determine if stores are in the same segment is to look at the brands they carry. Stores which carry the same brands  are grouped in one segment under this approach. This means, for example, that a department store, the department stores discount outlet and an off price retailer will be in the same segment if they carry the same brands.  A classic example would be Filenes and Filenes Basement. Filenes was a department store and originally placed its out of date

or less successful merchandise at its own discount outlet Filenes Basement. The brands were the same, so Filenes and Filenes Basement would be in the same segment. Many department and specialty stores have followed the Filenes model resulting in a proliferation of discount malls such as that at Cabazon. Under this analysis, a Reebok store at Cabazon and a Nike store at Beverly Center would be in the same segment because they draw similar customers seeking comparable brands.

Most department stores sell some out of date merchandise to off price retailers. This is true of Macys' which makes "sales of excess inventory to third parties."[14] One of the largest of these off price retailers is Ross Stores. Ross purchases inventory from department stores and  carries the same brands as department stores.  Ross may well have acquired merchandise directly from Macys'. Since Ross carries comparable or identical brands, it is fairly placed in the same segment as Macys'.  Ross spends significant amounts advertising that it carries the same brands as department stores. Over the last three years it spent about $160,000,000 on advertising.[15]

L.A. Triumph has sold its "Material Girl" line to department stores such as Bealls and specialty stores which inhabit the same malls as Macys', like Charlotte Russe.  It has also sold "Material Girl" apparel to Ross Stores. These combined sales exceed $2 million during

---

[14]   Macys' 2010 Annual Report, p. 17.

[15]   Source:retailsails.com/monthly-sales-summary/rost/annual, 7/8/11.

the last nine years. L.A. Triumph sells its "Material Girl" line in the same apparel market segment as Macys'. This is not surprising. If one compares garments from the two "Material Girl" lines, it can be hard to tell which is which. Exhibits D.

## 8.   Concert Related Apparel Is in a Different Segment of the Apparel Market than Apparel Sold in Department and Specialty Stores

A much different segment of apparel sales from department stores are concert promotion apparel sales.  For example, the 2007 agreement between Madonna's company Boy Toy and Live Nation defines "merchandise" as products including T-shirts, hats, sweatshirts, jackets, mugs and posters sold at "Artists Concerts or on Artists Website."[16] Clearly this clothing is intended to be sold at concerts, in connection with concert ticket sales and through special websites about Madonna. While some concert merchandise is certainly sold at retail stores, such as stores near concert venues, the target audience is fans of Madonna and her music. This merchandise is musician and event driven, not trademark driven. These items are souvenirs of an event rather than efforts to round out one's wardrobe. The purpose and places of sales are quite different from purchases at a department or specialty clothing store.  MG Icon and Purim recognize that concert items are in a different category, as their license provides a carve out of these rights.[17]

---

[16] Recording, Merchandising and Touring Agreement, 2007, §21.42, LN000144.

[17] License §1.4(b)(i),(ii), definition of "Tour Merchandise" - merchandise related to perfomances.

**9.     The Documents Provided by Live Nation, Winterland and Signatures  Are
Not Reliable Sources of Information about the Use of the "Material Girl"
Trademark.**

A number of documents were provided about possible apparel sales in connection
with concert tours: Live Nation documents nos. MG000197 - 207, 246; Winterland
documents nos. MG000156 - 175 and Signatures documents nos. MG000195 -6. Some of
these documents state "Material Girl" on them, some do not. Under apparel business
standards none of these documents are reliable sources of information about the sales of
apparel with the "Material Girl" mark.  These documents are summaries which could have
been created on any computer (or in some cases, typewriter), they are not apparel
business transaction documents. Transaction documents are documents directly used in
the business transactions, such as: manufacturing orders, manufacturing invoices,
manufacturing specifications, cutting records, shipping documents, retailers orders and
invoices to retailers.  Transaction documents are reliable because they reflect the actual
manufacturing  and sales processes and can be checked against one another to verify their
accuracy.  For example, if only 100 shirts were manufactured, 1,000 shirts could not have
been sold. While not all of the transaction documents would be required to provide
reasonable reliability about the volume of sales of clothing with "Material Girl," the
documents reviewed do not include any transaction documents.

//

### 10.    Business Bases of Opinions

My analysis and opinions about the apparel business, including business practices, brands and retail sales,  are based upon my knowledge of the generally accepted standards in the apparel business. I know these standards and that these standards are generally accepted in the apparel business as a result of my extensive work in and with apparel companies during the last 25 years.

My analysis and opinions about licensing are based upon my knowledge of the generally accepted standards in the consumer trademark licensing business. I know these standards and that these standards are generally accepted in consumer trademark licensing as a result of my extensive work in licensing, including participation in thousands of negotiations with licensors, licensees, professional licensing agents and attorneys over the last 25 years.

### 11.    Conclusion

There is no reliable information that use was made of "Material Girl" on apparel in connection with concert tours. There is no basis for concluding that Boy Toy, Bhakti Touring or Madonna had any ownership or interest in the mark "Material Girl" on clothing. Assuming, without foundation, that one of these entities had ownership or interest in "Material Girl," none of these entities transferred any interest to Purim.  Assuming, without

E:\EXP\reportlatriumph7/13/11                          16

foundation, that Purim had some interest in "Material Girl," it failed to grant any interest to MG Icon.  Assuming, without foundation, that MG Icon received some interest or right to use "Material Girl," the license between it and Purim was a naked license.

Starting from a variety of different points, the conclusion is the same, MG Icon does not have a trademark interest in or right to "Material Girl" on apparel.

_____

Antonio R. Sarabia II                                    July 13, 2011

**ANTONIO R. SARABIA II**
3463 TANGLEWOOD LANE
ROLLING HILLS ESTATES, CA 90274
FAX: (310) 377 5039
PHONE: (310) 377 5171
asarabia@cox.net

R E S U M E

EXPERIENCE

1994 - Present   **Expert Witness, Consultant and Law Practice**

Emphasis on: apparel industry transactions and operations, licensing, international intellectual property, including trademarks, copyrights and infringements; domestic and international contracts. Preparation of sales, manufacturing, distribution and import agreements.

1984 - 1993

Executive with Guess?, Inc., a major international fashion company with annual revenue of over $450 million, in positions including Licensing and Trademark Counsel, Vice President of Licensing and General Counsel.

Establish company policies in numerous areas including trade secret protection, personnel, business contracts, licensing, trademarks, copyrights, and litigation. Supervise, negotiate and resolve hundreds of disputes such as similarities between competing garment designs, logos, copyrights and trademarks. Confer with and advise the Board of Directors on a wide range of matters.

Work closely with senior managers in all departments including design, marketing, promotions, sales, production, import, export, trim, and piece goods. Negotiate, prepare and review contracts for all phases of the apparel business, including operation of retail stores, foreign and domestic manufacturing, purchasing agents, sewing and cutting, fabric purchase, product display, advertising, distribution agreements, buy/sell agreements and employment agreements. Review problems of performance in apparel contracts.

Counsel management in legal and administrative compliance in United States and overseas, including laws applicable to the garment industry, retail store operations, labor laws, U.S. customs requirements and antitrust.

Plan licensing and distribution for the Company by targeting products and countries in which to recruit licensees and distributors to increase revenue. Qualify potential licenses and distributors (analysis of current operations and management).

Nine years of experience in negotiating and writing  domestic and international trademark licenses  and distribution agreements (for apparel and other products) with a variety of countries worldwide such as Argentina, Australia, Brazil, Canada, Chile, Canada, Hong Kong, Japan, Korea and  Mexico.

Supervise licensing department in monitoring licensee compliance, enforcement of licenses, interpretation of licensee and licensor obligations and termination of licenses.  Participate in mediation and arbitration of licensing disputes.

Creation of an international program to control counterfeiting, diversion and unauthorized sales of garments.


1980 - 1984   **Associate**
        Ball, Hunt, Hart, Brown and Baerwitz

Responsibilities included working with clients and addressing their various legal problems. Diversified experience in civil and business litigation, including trials by judge, discovery, writs, appearances before regulatory agencies; commercial and real estate transactions.


1979 - 1980   **Associate**
        Jack Heller and Associates, Realtors
        A commercial real estate company.

1978 - 1979   **Associate**
        Forster, Gemmill & Farmer
        A law firm.

EDUCATION
University of Chicago Law School, J.D. June 1978
Occidental College, Los Angeles, A.B. 1974 (magna cum laude),
    Philosophy; Phi Beta Kappa


BAR MEMBERSHIPS
Supreme Court of California
United States Court of Appeals for the Ninth Circuit
United States Federal District Court for the Central, Eastern,

Northern and Southern Districts of California
United States Tax Court


<u>OTHER ACTIVITIES</u>

Testimony in civil and criminal, state and federal cases on issues related to the apparel industry, licensing and intellectual property.

1.    Publications:

"Paying for the Costs of Crime: Criminal Defendants, Insurance and Restitution," <u>Los Angeles Daily Journal</u>, June 20, 2011.

"Restitution and Personal Injuries - Clients Might be Leaving Money on the Table," <u>Los Angeles Daily Journal</u>, May 3, 2011.

"How Much Do You Know about Victims' Rights?," <u>Los Angeles Daily Journal</u>, October 20, 2010.

Restitution is Often Overlooked as a Punishment for Criminals," <u>Los Angeles Daily Journal</u>, September 2, 2009.

"The Power of Victim Restitution in Civil Cases," in <u>Advocate Magazine</u>, July 2009.

"Rehashing Old Laws Won't Do More to Protect Crime Victims," in <u>Los Angeles Daily Journal</u>, January 13, 2009.

"Investigative Peril," in <u>Los Angeles Daily Journal</u>, June 27, 2007.

"Victim Restitution," in <u>California Criminal Law Procedure and Practice</u> (1998 Edition through 2010 Edition).

"Keeping An Eye on HP," in <u>Los Angeles Daily Journal</u>, December 28, 2006.

"Follow 'Falkowski' and 'Lucian' to Control Annual Bonus Programs," in <u>Los Angeles Daily Journal</u>, August 17, 2006.

"Judgment and Sentencing," in <u>California Criminal Law Forms Manual</u>, contributor (Second Edition, 2006 and updates through 2010).

"Plaintiffs Counsel as Escrow in Class Actions - It's Plain Wrong" in <u>Los Angeles Daily Journal</u>, December 16, 2005.

"Restitution," California Judges Benchguides, <u>Benchguide 83</u>, consultant (2005, 2007, 2009, 2010).

"Marked Recovery," in <u>Los Angeles Lawyer</u>, April 2005.

"Google Blithely Ignores Legal Rights of Trademark Holders," in <u>Los Angeles Daily Journal</u>, November 25, 2004.

"Shared Weight," in <u>Los Angeles Daily Journal</u>, September 25, 2003.

"Do Not Confuse Criminal and Civil Subpoenas Duces Tecum," in <u>Los Angeles Daily
Journal</u>, October 16, 2002 (co-author with William Kopesky).

"Restitution Bind - The Harvest Court Performed Legal Gymnastics and Ignored Precedent,"
in <u>Los Angeles Daily Journal</u>, September 5, 2001.

"Forgotten Citizens," in <u>Los Angeles Daily Journal</u>, April 28, 2000.

"Civil Litigators Should Consider Action for Criminal Restitution," in <u>Los Angeles Lawyer</u>,
March 1999.

"Pay Back, California's Restitution Statute," in <u>Los Angeles Daily Journal</u>, August 26, 1996.

**Panels**

"Victims' Rights and Restitution: Whose Case Is It?" 82nd Annual Meeting of The State Bar
of California, September 10, 2009.

"Prop. 9 and Victims' Rights:  How it impacts charging, trial decisions, sentencing, parole
and restitution," Fidler Institute on Criminal Justice, Loyola Law School, May 1, 2009.

"Protecting Victims' Rights in California: How Should it be Working?"  Panelist, Loyola Law
School, November 5, 2010.


2.      Compensation:      $600 per hour.


3.      Deposition and trial testimony within the last four years:

        <u>Cassidy v. Reebok</u>, C.D. Ca. 2:10cv09966, 2011.

        <u>Jivago v. Kleinberg</u>, SC099941,  Los Angeles County Superior Court, 2010.

        <u>Callan v. Christian Audigier, Inc.</u>, C.D. Ca. CV 08-8072, 2009.

        <u>Rosmarin v. Buchalter</u>,  Jams  Arbitration, Orange County  No. 1200040434,
        2009.

Citizens of Humanity v. Caitac, #38090, Los Angeles County Superior Court, 2008.

Cassel v. Wasserman, #LC070478, Los Angeles County Superior Court, 2008.

Bayer Clothing Group v. Sears, N.D. Il. #07CV2395, 2008.

SPI Manufacturing v. Pacific Sunwear, #06CC04289, Orange County Superior Court, 2008.

Mourad v. Lada Jeans, C.D. Ca. Case# CV06-2649, 2007.

One Industries v. O'Neal Distributing, S.D. Ca. Case# 06 CV 1133, 2007.

**Information and Resources Used by Antonio R. Sarabia II
in Preparation of His Report**

First Amended Complaint and Answer of Macys'

Purim/MG Icon License

Declarations: Furano, Tarshis, H. Lakhani, Madonna, Boyajian, Arledge, Copman

Depositions: Furano, Hafiz Lakhami (partial), LA Triumph (Amin Lakhami, partial), Oseary (partial), Tarshis

Macys' License

Membership Interest Purchase

Defendants' Motion for Summary Judgment and Opposition - Pleadings and Exhibits both sides

McCarthy on Trademarks

Freecyclesunnyvale v. The Freecycle Network (9th Cir. 2010) 626 F.3d 509

Barcamerica International v. Tyfield Importers (9th Cir. 2002)289 F.3d 589

Briceno v. Scribner (9th Cir. 2009)555 F.3d 1069

Hangartner v. Provident (9th Cir. 2004) 373 F. 3d 998

Case docket updated as of 6/29/11

Plaintiff's Requests for Production to Defendants (MG Icon, Material Girl Brand, First and Second Set to both and Third Set to Material Girl Brand), Defendants' Responses to First and Third Set

Conversations with with C. Arledge and I. Vakil

LA Triumph sales documents

Live Nation documents nos. MG000197 - 207, 246,  Winterland documents nos. MG000156 - 175 and Signatures documents nos.  MG000195 -6

Exhibit C                                                    24

Motion to Dismiss Madonna

Order Granting Motion to Dismiss Madonna

Information on Macys' Promotions and Sales

Macys' Annual Reports, 2008 - 2010

E-mails between counsel about Madonna deposition and testimony

Signatures, Sony Signatures and Live Nation contracts with Madonna

U.S. Patent and Trademark Office web site

MG Icon trademark applications

Exhibit C                                                25

"Material Girl" Apparel

 



# EXHIBIT B

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3

4   L.A. TRIUMPH, INC., a California )

5   corporation,        ) Case No.

6       Plaintiff,  ) CV 10-6195

7      vs.     ) SJO (JCx)

8   MADONNA LOUISE VERONICA CICCONE, )

9   an individual; MATERIAL GIRL  ) Volume I

10  BRAND, LLC, a Delaware limited  ) Pages 1 to ^

11  liability company; MG ICON, a   )

12  Delaware corporation; and    )

13  1 through 10, inclusive,    )

14       Defendants.   )

15

16     TRANSCRIPT DESIGNATED CONFIDENTIAL

17

18    VIDEO DEPOSITION OF ANTONIO R. SARABIA

19         TAKEN ON

20       FRIDAY, AUGUST 26, 2011

21

22  Reported by:

23  BRENDA R. COUNTZ, RPR-CRR

24  CSR NO. 12563

25

1   That's why I was engaged.  So that has been my

2   assignment from the beginning and that's what I

3   believe my report reflects.

4        Q.  Well, you are aware that legal opinions

5   are not admissible evidence in a trial, correct?

6        MR. VAKIL:  Objection, calls for a

7   legal conclusion.

8        THE WITNESS:  That's generally right.

9        Q.  So your position is that all of the

10  opinions you've given in this case as reflected

11  in your written report are business opinions and

12  not legal opinions?

13       A.  Well, you see, my charge in this case

14  is not to make those kinds of decisions.  I've

15  been hired as an expert to give business opinions

16  and I've written my report with that.

17       I have not been asked to, okay,

18  Mr. Sarabia, there's going to be a motion inlimb

19  knee, we expect you to brief this.  That's not

20  what I'm doing in the case.

21       Q.  But you are currently a lawyer, right?

22       A.  Yes, I am.

23       Q.  And you're an officer of the court,

24  right?

25       A.  Sure.

                          25

1      Q.  And you wouldn't give any legal

2   opinions or other opinions that you thought

3   violated the rules of evidence, would you?

4      A.  I certainly wouldn't want to violate

5   the rules of evidence.

6      Q.  Okay.  So, based on you are an active

7   member of the bar and your expert opinion, are

8   any of the opinions you are offering in this case

9   legal opinions as opposed to business opinions?

10      A.  Okay.  May I have the question back

11   please.

12          (The record was read by the reporter.)

13      A.  I'm sorry.  I find that confusing

14   because you have the word expert early on.  So

15   that seems to say well I'm an expert in law of

16   evidence and so give my view.

17          I'm not working in this case as an

18   expert on the law of evidence nor do I, in

19   general, profess to be a expert on the law of

20   evidence.  So I have a problem with the beginning

21   of that question that prevents me from answering

22   the rest of it.

23          But I'm happy to take another try of it

24   if if you would like to change it.

25      Q.  That was a great answer.  That was

26

1    good.

2        Let me go back.  As an officer of the

3    court and a trial lawyer, given the experience

4    that you have, are any of the opinions that you

5    put in your report legal opinions as opposed to

6    expert opinions?

7    A.  I'm confused.  What does officer of the

8    court have to do with that?

9    Q.  You have an obligation to tell the

10    truth and to not make any misrepresentations of

11    law or fact to a judge.  Do you understand you

12    have that duty as a lawyer?

13    A.  Yes.

14    Q.  So now can you answer my question?

15    A.  Which is did I make any

16    misrepresentations of law or fact, no.

17    Q.  That wasn't my question, was it?

18    A.  Well, that's why I asked what did you

19    mean by officer of the court and that's how you

20    explained it.

21    Q.  Please read back my question, please.

22    (The record was read by the reporter.)

23    MR. VAKIL:  Objection, vague, compound,

24    very confusing?

25    THE WITNESS:  I don't believe so.

27

1   licensors that you can tell me that you provided

2   expert services for since 1993?

3      A.   Those are the only ones I can recall

4   off the top my head and obviously we've already

5   discussed the carve out for legal work.

6      Q.   Okay.  Have you ever represented any

7   person or entity in the music industry?

8      A.   No, I don't think so.

9      Q.   Have you ever represented any licensor

10   or licensee, person or entity with respect to

11   sales of clothing at concerts?

12      A.   No.

13      Q.   Have you ever done any work, legal work

14   or business work with respect to sales of

15   merchandising including clothing at concerts?

16      A.   No.

17      Q.   Now, you gave an opinion that sales of

18   clothing by Madonna at music concerts and tours

19   is different than sales through retail clothing

20   stores, right?

21      A.   Yes.

22      Q.   And why do you think there's a

23   difference?

24      A.   Well, for several reasons.  One of them

25   is the venue because that makes a difference.

1    Where clothing is sold is one basis for

2    segregating goods.  Another is the purpose.

3    There's one thing to go this to a retail store

4    looking for clothes and another thing going into

5    a concert and saying I'll buy some souveniers.

6        Q.  Do you have any experience with the

7    reasons that people by tee shirts or

8    merchandising at concerts?

9        A.  Do you mean if I've been to a concert

10    or do you mean have I ever studied concerts.

11        Q.  Yes?

12        A.  No, I've never studied concerts, no.

13        Q.  So this opinion about what you perceive

14    as the difference between sales at concerts

15    versus retail stores is something you know as a

16    layperson?

17        A.  No, I'm not giving an opinion as a

18    layperson in this case.

19        Q.  So what is the foundation for your

20    opinion that there is a fundamental difference

21    between selling Material Girl clothing at a

22    concert versus Material Girl clothing through

23    retail stores?

24        A.  The information and testimony in this

25    case combined with my 25 years of business

46

1    experience in the apparel business.

2        Q.  So in your 25 years of business

3    experience in the apparel business you've never

4    done any work with respect to music people,

5    selling merchandising at concert venues, correct?

6        A.  Right.

7        Q.  So what is it about your experience

8    that makes you an expert on comparing clothing

9    sales at concerts versus clothing sales through

10   retail stores?

11       A.  Because in the apparel business you can

12   give an opinion about what kind of store or what

13   level of market something is being sold at.  I

14   can give an opinion about sales at wall mart in

15   Missouri and you could cross-examine me,

16   Mr. Sarabia have you ever been to Missouri and

17   maybe my answer is no but that's irrelevant to

18   the question of is there substantial experience

19   in the apparel industry and does that experience

20   include examining, considering, understanding,

21   learning about various levels and ways and means

22   in which garments are sold.  Completely different

23   issues.

24       Q.  What is your experience and what have

25   you learned about the way that garments and

47

1    on top of my experience in the apparel business

2    gives my opinion a very solid foundation.

3        Q.  So then your opinion is based

4    primarily, maybe only on information that you've

5    read in connection with depositions, license

6    agreements or other documents that have been

7    produced this this litigation on that issue?

8        A.  Wrong.

9        Q.  What else is involved?

10       A.  I told you my 25 years of experience.

11       Q.  What, in your 25 years of experience

12   qualifies you to give an opinion that the market

13   at music concert tours is different than the

14   market in clothing stores for Material Girl

15   branded clothing?

16       A.  Because during the course of my

17   experience I learned a lot about how branded

18   clothing is sold, the various venues and levels I

19   was dealing with counterfeiting at swap meets

20   which is actually a level below concerts.

21           I've dealt with Neiman Marcus.  I've

22   dealt with Macy's.  I've dealt with the full

23   range refer tail venues at which clothing could

24   be sold and company sent H cert is just another

25   one on that whole array.  It's not the lowest.

49

1        I would say the lowest is probably

2    garage sales.  Then you have flea markets and so

3    on.  And then Wal Mart being closer to the bottom

4    and Neiman Marcus being higher.

5        And then you have stores like Prada as

6    I explained in my report.  There is a whole range

7    of venues at which goods are sold.  And where you

8    are sold makes a big difference in a number of

9    things as I wrote in my report.

10        And so those are things that I was

11    concerned about while dealing with my report.

12    And once you understand this range, because of

13    your apparel experience, you don't have to say,

14    well Mr. Sarabia, you can't say Prada is at the

15    high end.

16        How many times have you bought a $5,000

17    pen at Prada.  Well the answer is I've never bod

18    a $5,000 pen at Prada.  But I don't need to buy a

19    $5,000 pen at Prada to understand where Prada is

20    in the range of apparel sales.  Any more than I

21    need to go the to every one of or any of

22    Madonna's concerts to understand how the apparel

23    sales work at those venues.

24    Q.  Have you ever been to a Madonna

25    concert?

50

1    A.  No.

2    Q.  Are you a fan of Madonna?

3    A.  I like some songs.

4    Q.  Do you like Material Girl?

5    A.  Not one of my favorites of Madonna.

6    Q.  Were you aware of it in the eighties?

7    A.  Yes.

8    Q.  In your mind who is the Material Girl?

9    A.  Well, I often would think of Madonna

10   because of my age.

11       Q.  In the mind of the public, based on

12   what you knee, who does the public associate the

13   term Material Girl with?

14       A.  Well that would depends a lot on which

15   public you mean.  In general I don't know I know

16   if I talk to my 11 and 13 year old daughters and

17   I say Material Girl they go, what are you talking

18   about?

19       Q.  Really, you'd be surprised how in

20   teenagers know exactly who the Material Girl is.

21   Have you ever asked them?

22       A.  No I haven't.  I could be wrong with

23   that too.

24       Q.  Have you ever seen any surveys about

25   Material Girl?

1   plaintiff and the defendant.

2       Q.  And is that league will opinion or a

3   business opinion?

4       A.  What I just said or the opinion in A?

5       Q.  The opinion in A.

6       A.  The opinion in A has to do based on my

7   licensing and business experience, is what my

8   opinion is based on.

9           Many times factual opinions have legal

10  consequences and I understand that as a lawyer.

11  I'm sure that we all do.  But I'm asked to give

12  opinions on factual issues and that's what I've

13  done here.

14      Q.  How about item B, the license between

15  Purim and M G I con is a nakeded license.  That

16  was your idea to give that opinion in this case?

17      A.  It was.

18      Q.  What is a naked license?

19      A.  That means that the licensor has not

20  retained quality control rights.  Neither

21  retained them nor exercized them.  And that

22  therefore the licensee is allowed unfettered use

23  of the mark or brand.

24      Q.  And the term naked license, is that a

25  legal term?

75

1     A.  I think it may be one of those double

2     entendres, you know

3     Q.  One of those what?

4     A.  Double meaning terms.  In other words,

5     there's a factual meaning and a legal meaning.

6     But I'm focused on the facts in this case.  And I

7     think it's got a common sense factual meaning

8     which is naked means it's got no clothes or no

9     protection.  And when a trademark is unprotected,

10    it's naked.

11    Q.  And what is the result of the trademark

12    that is acquired through a naked license?

13    A.  Well now you are asking for a legal

14    consequence of a factual event and I'm not giving

15    legal opinions in this case.

16    Q.  So you have no opinion about that?

17    A.  I know what courts may do about it,

18    yes.  It depends on what the court determines.

19    Q.  So you are not giving an opinion about

20    that in this case?

21    A.  I'm not going to be telling or giving

22    an opinion to the judge, hey, it's naked, and you

23    need to do this and decide this.  That's not my

24    role here.

25    Q.  Okay.  And then the last one in exhibit

76

1    lists.  I thought they were really just lists and

2    they could have been created at a typewriter or

3    computer as opposed to transaction documents.

4    Transaction documents are documents that are used

5    in the manufacture, shipment or sale of goods.

6    And I didn't see transaction documents.  I just

7    saw lists and anybody can make lists from

8    anywhere.

9         And that doesn't verify the sale or

10   support the sale of a particular item of apparel

11   with a particular trademark on it because it's

12   not a transaction document.

13       Q.  So based on your experience, the most

14   reliable source of detailed information would be

15   the source documents themselves, meaning the

16   invoices, if purchase orders, the shipping

17   documents, right?

18       A.  I wouldn't phrase it that way but I

19   think we agree.

20       Q.  And your concern was that the Live

21   Nation documents that you looked at were summary

22   documents?

23       A.  Well, they purported to be summary

24   documents and because they were not anchored to

25   anything, they could be fiction.

78

1      Q.  So, do you believe that the Live Nation

2    documents that were provided to you are fiction?

3      A.  I believe they are unreliable.  And I

4    never talked to anybody that made them or wrote

5    them.  So I'm not saying somebody lied when they

6    wrote them.  I'm just saying looking at them they

7    are unreliable.  Nobody should rely on these.

8           Now, I'm not accusing anybody of lying

9    because I don't know who did it and I don't know

10   the circumstances.  But I was trying to look at

11   it, okay, is this something that an independent

12   open minded person can comfortably rely upon as

13   establishing use of a trademark.  And the answer

14   to that was open and shut, no.

15     Q.  Okay, so you are going to tell the jury

16   that the Live Nation documents that you saw are

17   not evidence of trademark usage by Madonna or her

18   companies?

19     A.  No.  I didn't say that.

20     Q.  Well what are you going to tell the

21   jury about the reliability of those Live Nation

22   documents that you looked at?

23     A.  I'm going to say they are not reliable.

24     Q.  In what way are they not reliable?

25     A.  Because they are not supported -- first

79

1    of all, they are not source documents and

2    summaries can be reliable if they are supported

3    by source documents.  So, I'm not saying it's

4    impossible it could be reliable.  I'm saying the

5    way they are now they are not reliable because

6    there are no source documents.  Anybody could

7    have made these up.  Some of them had to go back

8    before computers so it could have been a type

9    brighter.  I see you are hissing now so I assume

10   that means I'm supposed to stop so I'll stop.

11       Q.  So you don't believe those documents?

12       A.  I don't believe they establish use of

13   the Material Girl trademark, okay, because they

14   are unreliable.

15       Q.  So what would establish use of the

16   Material Girl trademark in 1985 to your

17   satisfaction?

18       A.  Source documents.  And as I mentioned

19   in my report when you talk about the source

20   documents I'm sorry I mean the transaction

21   documents, you don't need necessarily all of the

22   transaction documents.  You don't need everything

23   from the initial sketch to the cutting to the

24   prototype samples, to the manufacturing order to

25   the shipment, to the manufacturing invoice, to

80

1    those types of documents that you so aptly

2    described just now for 25 years?

3        A.  Maybe.  I don't know.  I can't recall a

4    specific company that I saw that they had 25 year

5    old records.  I've been to a lot of warehouses

6    with pretty old records but are they exactly 25

7    or 20, I don't know.

8        Q.  Well, based on your experience, are you

9    surprised that Live Nation could even come up

10   with those documents from the period 1985 to 1997

11   before L.A. Triumph registered it's trademark?

12       A.  Well I would agree with you in some

13   ways it's a little curious.

14       Q.  Curious?

15       A.  That's why I was worried about it.  The

16   fact that it's a little curious and not reliable,

17   yeah.

18       Q.  Is there anything that you saw on the

19   document that specificcally suggested to you that

20   they were forged, false, fake or anything like

21   that?

22       A.  I'm not an independent document

23   examiner.  That's not my credential and I won't

24   be offering any opinions as to the validity of

25   documents whether they were forged or altered.

84

1    That's outside the scope of my expertise.

2        Q.  Bit your opinion to the jury is going

3    to be that they should not rely on those Live

4    Nation documents, correct?

5        A.  Yes.

6        Q.  And why would you tell the jury that

7    those Live Nation documents, annual documents

8    from 1985 to 1997 should not be relied upon by

9    the jury?

10       A.  Well, this is if first I've ever been

11   heard of them -- what do you mean annual?  You

12   put annual in your question.  Are you now telling

13   me, making a representation to me that those were

14   prepared annually because I haven't seen that

15   anywhere in this case..

16       Q.  So you haven't seen all the documents

17   from Live Nation then?

18       A.  No.  It's just that I've never seen any

19   testimony from anybody that we prepared these

20   annually.

21       Q.  Okay, so strike annually.  Answer my

22   question.

23       A.  I'm sorry.  I've lost the question.

24   Bear with me.

25       Q.  Read it back please.

85

1       A.  It is and below as well.

2       Q.  And I'm having a terrible time reading

3   your handwriting.  What does that say?

4       A.  To the right it says other years.

5       Q.  Okay?

6       A.  And then below that it says "please

7   file L.A. Triumph sales.

8       Q.  Okay, so the top of the second page of

9   Exhibit 105 is the total that you ran with your

10   assistant's help for L.A. Triumph Material Girl

11   sales for 2002 and 2003, correct?

12       A.  Incorrect.

13       Q.  What is it?

14       A.  It's the total for selected retail,

15   sales to selected retail stores.

16       Q.  Who selected those retail stores?

17       A.  I did.

18       Q.  And which ones did you not select?

19       A.  That I don't remember.  I'd have to see

20   the invoices.  In fact, for example, I didn't

21   collect MedGear because I remember that one

22   because you put it in front of me in Exhibit 103

23   but there were certainly a good number of other

24   ones I didn't select, I wasn't interested in.

25       Q.  Why were you interested in these three

108

1    and not the others?

2        A.  Because I wanted to get an idea of

3    their business at a certain level of the market.

4    And again, I was using the brand approach.  So I

5    was trying to identify a level of the market that

6    was on the same level as Macy's using the brand

7    approach and get an idea of whether their sales

8    were minimal, significant, insignificant, get

9    some idea of how big those sales were.  Did they

10   break a million dollars or were these token sales

11   of $5,000 over ten years, which would lead to

12   different conclusions depending on what the sales

13   supported.

14       Q.  What other years are reflected in the

15   second grouping of customers there?

16       A.  I think it's the same years.

17       Q.  Okay. Now why were you comparing 2002

18   and 2003 invoices against Macy's Material Girl

19   invoices from 2010 and 2011?

20       A.  Because I was looking at sales of

21   material girl branded products in both cases.  So

22   I was trying to compare Material Girl to Material

23   Girl.

24       Q.  Well why didn't you compare L.A.

25   Triumph current Material Girl sales to Macy's

109

1    current Material Girl sales?  Why did you have to

2    rely on numbers that were eight or nine years

3    old?

4        A.  Because I was looking at the spectrum

5    of L.A. Triumph's business and trying to see if

6    they ever had a significant volume of business at

7    the same level as Macy's with Material Girl.  And

8    the answer might have been they never did or they

9    did in this time period.  And I found a time

10   period where they did.

11       Q.  Well wouldn't your analysis be best if

12   you were comparing L.A. Triumph 2010 sales to

13   Macy's 2010 sales rather than go back and using

14   numbers that are eight or nine years old?

15       A.  I don't think it would make a big

16   difference once you get to a certain volume of

17   business.

18       In other words, let me more fully

19   answer your question.  If the sales led you, by

20   taking the different time period -- for example

21   let's say I just looked at 2010 and it turned out

22   that there were very few sales by either Macy's

23   or L.A. Triumph, you might be tempted to reach a

24   conclusion about their over all business but that

25   would be incorrect.

110

1      You need to look at the broader

2  spectrum if it's available.  Obviously when have

3  you a Macy's Material Girl line there is a fairly

4  nair Roy time range that's available.  It makes

5  more sense to look at a broader time range with a

6  product duct like line that is older.

7      Q.  Did you look at any L.A. Triumph

8  Material Girl sales for the years 2005?

9      A.  I saw invoices in different years.

10      Q.  Did you add up those invoices to see

11  the total volumes like you did on Exhibit 105?

12      A.  I don't think see.

13      Q.  Why not?

14      A.  Because I didn't see a significant

15  amount of sales.

16      Q.  How about 2006.  Did you see L.A.

17  Triumph material gross sales for 2006?

18      A.  You know I can't pinpoint by various

19  years.

20      Q.  Well, how about from 2005 to 2010.  Did

21  you see any significant amount of sales of L.A.

22  Triumph term girl goods in the period 2005 to

23  2010?

24      A.  I don't recall what those figures were.

25  I don't think they were very large but I don't

111

1    remember.

2        Q.  Did you ask why the figures for 2005 to

3    2010 were not very large?

4        A.  I don't remember asking that question.

5    The question I asked was do I have everything and

6    I was told yes, I have everything.

7        Q.  So you were told, when you asked that

8    question do I have everything, you meant do I

9    have all of the invoices showing L.A. Triumph

10   Material Girl sales, correct?

11       A.  Right.

12       Q.  And for what years did you understand

13   that you had all of the L.A. Triumph invoices for

14   Material Girl sales?

15       A.  I think it was about a ten year range.

16       Q.  So about 2002 to 2010?

17       A.  I think it might have gone back before

18   1010 so maybe 12 years.

19       Q.  Okay, now.  So for trademark purposes,

20   did you consider at all that there were very few

21   sales by L.A. Triumph of Material Girl clothing

22   from 2005 to 2010?

23       MR. VAKIL:  Objection, misstates the

24   evidence, assumes facts not in evidence.

25       THE WITNESS:  Which trademark purposes.

112

1     A.  No.

2     Q.  And at the regular price on the second

3  set of columns there for December 31, 2010, L.A.

4  Triumph values its inventory at retail regular at

5  $3,089,000.  Does that knowledge affect any of

6  your opinions in this case?

7     A.  No.

8     Q.  Are you curious as to why they are

9  carrying so much inventory?

10     A.  You know I'm always interested in

11  apparel businesses but aside from that kind of

12  general interest, I don't have any specific

13  curiosity about this.

14     Q.  Let's mark as Exhibit 106 another

15  document that came out of your files.

16     A.  (Perusing.)

17        (Sarabia Exhibit 106, Document

18        Bates Stamped SAR 004735 through

19        004736, was marked for

20        identification.)

21  BY MR. BELFIELD:

22     Q.  It's a typed document, two pages called

23  expert testimony on ultimate issues, law and

24  contracts.  Is that a memo that you prepared?

25     A.  No.  These are some notes that I

120

1   prepared some time ago and I think I updated them

2   a limit bet but most of them were written before

3   my engagement in this case.  But I did look at

4   them again and since I did look at them while I

5   was doing work on this case and updated them, we

6   produced them.

7       Q.  So you did offer this document, 106?

8       A.  Yeah, definitely.

9       Q.  Let's mark as Exhibit 107 your expert

10  report.

11      A.  (Perusing.)

12          (Sarabia Exhibit 107, Expert

13          Report of Antonia R. Sarabia II,

14          was marked for identification.)

15  BY MR. BELFIELD:

16      Q.  Did you write this report?

17      A.  Oh yeah, I definitely wrote the report.

18      Q.  Is it all your authorship or was

19  therein put from anybody else?

20      A.  Well, I wrote the report.  I discussed

21  my reports as I write them with my assistant,

22  sometimes with the law firms I work with.

23          And then, of course, I have a lot of

24  references to other material.  But in terms of

25  who wrote the report, the words of the report,

121

1    that would be me.

2         Q.  Now your assistant, that's rose?

3         A.  Yes.

4         Q.  What's her last name?

5         A.  Amezcua.

6         Q.  Is see that a lawyer, paralegal or a

7    secretary?

8         A.  I call her a legal assistant.  She's

9    not a paralegal and she's not a lawyer.

10        Q.  Did see that substantively contribute

11   to the expert report or is see that a clerical

12   person who does what you ask her to do, not to

13   demean her but to try to figure out what he does.

14        A.  Our relationship is a little less

15   structured than that.  I'm writing the report but

16   it's always helpful to discuss what you are

17   working on with somebody else that has at least a

18   passing familiarity with it.

19          Because I don't work with a lawfirm

20   with other lawyers, there are not other lawyers

21   down the hall I will talk to rose about issues

22   and occasionally she will have an idea or an

23   angle that I hadn't thought of or see that will

24   confirm that I'm on a track that makes some

25   sense.

                    122

1       Because one of the things I'm also

2  concerned about when you are writing a report is

3  are you communicating clearly.  It's all fine to

4  like dissect something and break it down into

5  little parts but if you can't communicate it

6  clear it doesn't really matter.  You need to be

7  able to communicate it so that's part of one of

8  the reasons I talk with her.

9       Does my analysis, my approach make

10  sense.  But it's more than just that.  It's more

11  than just lays ner because see that has

12  familiarity and she may have ideas, suggestions

13  or responses that are helpful.

14     Q.  What's rose's background?  Does she

15  have trademark or apparel background?

16     A.  No, not when see that joined me.  We've

17  been together for, I'd say about eight years now

18  but we've worked now together on a lot of

19  trademark and apparel cases.

20     Q.  Does she come to work T at your office

21  every day?

22     A.  She does.

23     Q.  Okay.  On the first page of your report

24  you start with the obvious.  This case is a

25  dispute over trademark rights to Material Girl.

123

1        Material Girl is a trademark, correct?

2        A.  Yeah.

3        Q.  Why?

4        A.  Because it's used on products to

5    communicate information about stores of origin.

6        Q.  Who is the source of origin for the

7    trademark Material Girl?

8        A.  Well, it depends what products and

9    when.  In fact, I know for example L.A. Triumph

10    is a source of some Material Girl products.

11    There have been at least two other parties that

12    were sources of Material Girl products and their

13    business was substantial enough or at least the

14    cost of the lawsuit was substantial enough that

15    Iconics or MG Icon decided to buy their interest,

16    buy their rights or it could be characterized as

17    a settlement of a suit.  I'm not privy to the

18    details but I know some of that money was tens,

19    hundreds of thousands of dollars.  So either they

20    had some Material Girl trademark rights or they

21    had claims that were going to cost so much to

22    dispute that it made sense for those rights to be

23    purchased.  So they might have rights as well.

24        And I not is the there are some other

25    registrants on the P T O.  Some of those marks

124

1    are dead.  So there's a variety of parties that

2    have used Material Girl as a trademark.

3        Q.  Does Madonna have any Material Girl

4    trademark rights?

5        A.  Well, you know, that's one of the

6    mysteries in this case and that's what I've tried

7    very, very, very hard to understand what rights

8    does she have.  How did see that get them?  What

9    did see that do with them?

10       Q.  I don't want to interrupt but we are

11   having the same problem.  I asked you a yes or no

12   question.  Does Madonna have any trademark rights

13   in term girl.  And if I want to know why I'll

14   then ask you why?

15       A.  Okay, fair enough.  Fair enough.

16           One of the reasons I'm having

17   difficulty is I haven't seen the fragrance deal.

18       Q.  The what deal?

19       A.  I think there's a fragrance deal see

20   that has.  She has one or two other deals which I

21   haven't seen.

22       Q.  Let's stick to clothing, 025 that's the

23   subject of this lawsuit.  You know this lawsuit

24   is limited to 025 clothing between Madonna and

25   Iconics, right?

125

1      A.  I'm not familiar with the term 025.

2      Q.  International code 025?

3      A.  Oh, 25. I'm sorry.  Okay.  I thought

4  you were talking about some case number that I

5  didn't know.  No, No, I'm very familiar with

6  class 25, yes.

7      Q.  So you understand that this case only

8  involves class 25 trademarks, right?

9      A.  Yes, I think that's right, yeah.  Based

10  on what I've seen in the case, I have a hard time

11  seeing her retaining any trademark rights.

12     Q.  So Madonna has no trademark rights in

13  025 clothing in your opinion?

14     A.  Let's be careful here.  I'm not giving

15  that opinion in this case.  I haven't been asked

16  to give that opinion and I'm not providing that

17  opinion.  We have to be careful here because

18  there are expert opinions which are formal

19  opinions in the case and there are other opinions

20  that I have do I like pasta or how do I like it.

21       So I'm not giving you an expert opinion

22  on whether she has any trademark rights other

23  than what's in my report.

24     Q.  Well, I'm asking you as you sit here

25  today as L.A. Triumph's expert witness, does

126

1   Madonna have any trademark rights in Material

2   Girl?

3       A.  Not that I've seen but that doesn't

4   necessarily mean see that doesn't.  But I am

5   confident that Purim didn't.

6       Q.  Why do you think Madonna does not have

7   any trademark rights in Material Girl?

8       A.  Because the documents that I've seen

9   from the various deals including the concert

10  promotion deals don't funnel those trademark

11  rights to her as they could have.  They funnel

12  them to other entities such as Bhakti.  Okay.

13      So I haven't seen any trademark rights

14  in the document I've reviewed which is certainly

15  not the universe of documents related to Madonna

16  and her businesses.  But of the documents I've

17  seen, I haven't seen trademark rights funneled to

18  her.

19      And so that's the basis of my

20  conclusion, the documents that I've seen in this

21  case and the testimony that I've seen.

22      Q.  Well, the trademark rights would be

23  funneled the other way they go from Madonna to

24  Boy Toy or Bhakti?  That's what would you expect,

25  correct?

127

1     A.  It depends on use.

2     Q.  Well Madonna's uses, beginning in 1985

3     preceded Boy Toy or Bhakti?

4     A.  Well, I haven't seen information on

5     those uses.  I totally relieve you because you

6     seem like a real reliable guy.  My scope of my

7     work in this case hasn't involved looking at her

8     uses before these concert deals.  All I've seen

9     is what happened in the concert deals.  She might

10    have done a million things before the concert

11    deals, I haven't seen them.

12    Q.  Well you've seen the Boy Toy and Bhakti

13    deals, right?

14    A.  I've seen the Boy Toy and Bach dedials,

15    that is correct.  I've never seen anything going

16    back.

17    Q.  Does Boy Toy have any trademark rights

18    in Material Girl?

19    A.  I think Boy Toy did, yeah.

20    Q.  And what trademark rights did Boy Toy

21    have?

22    A.  Well, the concert promotion deal said

23    trademark rights go back to Boy Toy in some of

24    the deals and Bhakti in other of the deals.

25    Q.  What trademark rights did Bhakti have?

128

1    A.  The same answer.

2    Q.  So Bhakti and Boy Toy, according to

3    your analysis the documents and other information

4    you've seen had trademark rights in Material

5    Girl, right?

6    A.  Yes.

7    Q.  Now, you said Purim does not have any

8    trademark rights.  Is that your opinion?

9    A.  Yeah.

10    Q.  Why is that?

11    A.  Because the entities that either had

12    trademark rights like I'm confident of like

13    Bhakti or Boy Toy or entities I don't know

14    everything about, like Madonna, none of those

15    entities gave trademark rights to Purim.

16    Q.  How do you know that?

17    A.  Because there's nothing in writing and

18    we have testimony saying un-unh, no oral deals,

19    no oral assignment.  Mr. Oseary, O S E A R Y, I

20    think testified that she never gave any oral

21    assignment.

22    Q.  Okay.  So, based on your 25 years of

23    experience, a license or an assignment of a

24    trademark certainly can be in writing, correct?

25    A.  Yes.

129

1     Q.  And based on your 25 years of

2   experience, a license or assignment of a

3   trademark can be done orally, correct?

4     A.  It's a possibility.

5     Q.  And an oral assignment or license is

6   just as legally enforceable as a written

7   assignment or license, correct?

8     A.  Often, yes.

9     Q.  Are there any other ways, based on your

10   experience as a trademark person and lawyer for

11   trademark rights to be transferred to somebody

12   like Purim?

13     A.  Well, not from somebody like Madonna to

14   somebody like Purim.  It would be oral or in

15   writing.

16     Q.  How about an implied by conduct or

17   course of conduct, transfer of trademark rights?

18     A.  I'm not familiar with that in

19   licensing.

20     Q.  You've never seen any legal discussion

21   about the transfer of a trademark right by

22   implied conduct?

23     A.  I don't recall that.  It could be.  I

24   don't recall.

25     Q.  So then your opinion about Purim not

130

1      Q.  How are you comparing the Material

2   Girl, Macy's and L.A. Triumph goods?

3      A.  I don't remember doing any comparison

4   of goods with the one exception was I did put on

5   here exhibit D and that's the only time I really

6   compared goods.  I didn't talk about that a lot

7   but on exhibit D I have photographs of some MG

8   Icon products and some L.A. Triumph products.  So

9   that's really the only comparison I did.  That

10   was not -- comparing products was not something I

11   did in this report.  I talked about other things.

12      Q.  Well, your report says that your

13   conclusion is that L.A. Triumph sold apparel with

14   the Material Girl mark at the same segment of the

15   apparel market in which Macy's sells apparel,

16   right?

17      A.  Absolutely.

18      Q.  What do you mean by same segment of the

19   market?

20      A.  Retail segment using the brand analysis

21   as I explained earlier.  But I'd be happy to

22   explain it again if you'd like me to.

23      Q.  Perhaps my question was inartful.

24   That's what I was talking about.  So your opinion

25   is that the Material Girl sales through Macy's

143

1   are sold to the same market segment as the L.A.

2   Triumph Material Girl sales through Ross, Bealls

3   and the other companies, right?

4        A.  That's pretty close, not quite right

5   though.

6        Q.  Okay, so the point being that the same

7   clients or customer dem graphic is going to go

8   into Macy's and go into Ross stores to buy

9   Material Girl, right?

10       A.  Similar market segment, yes, um-hum.

11       Q.  Now, if a 20 year old goes into Macy's

12  to buy Material Girl, do you agree that that 20

13  year old knows that the source of those goods is

14  Madonna?

15       A.  I don't know.

16       MR. VAKIL:  Objection.

17       THE WITNESS:  I haven't really worked

18  on that project so I'm not sure.

19       Q.  Well, if that same 20 year old goes

20  into Ross stores and buys L.A. Triumph's Material

21  Girl clothing, does that 20 year old know that

22  that Material Girl product is coming from L.A.

23  Triumph and not from Madonna?

24       A.  I'm not sure about the sophistication

25  of the hypothetical 20 year old customer.

144

1      Q.  No, I mean the last two years, three

2    years.

3      A.  The last two years?

4      Q.  Yes?

5      A.  The question is could I analyze their

6    sales the last two years.  I could analyze their

7    sales the last two years.

8      Q.  How come you didn't?

9      A.  Well--

10      Q.  Because there aren't any sales, right?

11          MR. VAKIL:  Objection, misstates the

12    nature of the evidence.

13          THE WITNESS:  (No response.)

14      Q.  All right, go to the first opinion

15    there we talked about to some degree?

16      A.  I'm sorry, what page are you on.

17      Q.  Page 5.  Purim did not have any

18    trademark rights in Material Girl."  That's your

19    expert opinion, correct?

20      A.  On page 5 I don't see that.  I'm sorry.

21      Q.  It's the heading.

22      A.  Oh this one, I thought you were talking

23    about up here.  Yes, I see that one.

24      Q.  Is that your expert opinion that Purim

25    did not have any trademark rights in Material

150

1    Girl?

2        A.  Yes.  We're talking about clothing as

3    it becomes clear later on.

4        Q.  And why is that your -- what's the

5    basis for that opinion?

6        A.  The basis are the rights that I saw

7    that preexisted seemed to deadend at Boy Toy and

8    Bhakti because I never saw any assignments coming

9    out of there.  Madonna might have had some

10   rights.  We don't know.

11        Neither Boy Toy, Bhakti or Madonna ever

12   did an oral or written assignment and Purim,

13   shockingly, never even claimed to own any rights.

14   It's very surprising.

15        Q.  Why is that surprising?

16        A.  Because virtually E every other license

17   I've ever seen the licensor says we own the

18   rights, we have better rights, we have more

19   rights, we have some rights.  It is very, very

20   shocking.

21        Q.  Well, if you are Madonna's lawyers,

22   that's the best thing you could say, right?

23        A.  Huge mistake.

24        Q.  Why not?  Get the deal and make no

25   warranty and representation as to what you have.

151

1    want to do is confuse you.  What affect does

2    Purim's failure to warrant and represent that it

3    owns the trademark rights have on the naked

4    rights issue?  None, right?

5        A.  No, I think it does because it is

6    remarkably consistent with the naked license.

7        Q.  Explain?

8        A.  Hey, this is a free for all trademark.

9    Nobody owns it, anybody can use it.  That's like

10   the essentials of the naked license.

11       Q.  So if they warranted and represented --

12   if Purim had warranted and represented that it

13   owned the trademark rights to Madonna, that would

14   be a factor, in your mind, against the finding of

15   the naked license?

16       A.  Minor.

17       Q.  Minor.

18       A.  There are much more important factors.

19       Q.  Right.  We will get to those.

20       Q.  Now in your report you say that Purim

21   never received an assignment or license of

22   trademark rights to Material Girl from Boy Toy or

23   Bhakti.  That's because you never saw a written

24   assignment, right?

25       A.  Partly.

153

1      Q.  And it's also because you saw no

2   evidence of an explicit oral assignment, right?

3      A.  Almost but not quite right.

4      Q.  What's not right about that?

5      A.  Well, I saw testimony that there wasn't

6   an oral transfer.  So that's a little different.

7   Then you say nor did Madonna.  How do you know

8   that about Madonna?

9      A.  I never saw any.  We had Oesary saying

10  there was no oral assignments, and I never saw

11  any paperwork.  So I saw neither written

12  assignment or license to Madonna and never heard

13  a denial of Oesary of there being any oral

14  assignments.

15     Q.  Has Madonna, to your knowledge ever

16  complained that she did not give the trademark

17  rights to Purim, MG Icon and Macy's?

18     A.  I never talked to her.

19     Q.  You've seen no evidence to the

20  contrary, right?

21     A.  May I have the question back.  It's a

22  little complicated.  I missed it.

23     Q.  Have you ever seen any evidence that

24  Madonna has complained objected to Purim, MG Icon

25  and Macy's uses of the Material Girl trademark?

154

1          MR. VAKIL:  Relevance.

2      A.  No, I don't think I have.

3      Q.  How about Boy Toy, any evidence of

4   that?

5      A.  Of what?

6      Q.  Any evidence of Boy Toy complaining or

7   are objecting that Purim, MG Icon or Macy's don't

8   have Boy Toy's rights to the Material Girl

9   trademark?

10      A.  No, I've never seen that.

11      Q.  Same question on Bhakti Touring, B H A

12   K T I, touring?

13      A.  No.

14      Q.  And page 6 you conclude that Purim

15   never had any rights of Material Girl to license

16   to MG Icon.  Is that your legal conclusion or

17   your business conclusion?

18      A.  That's my business conclusion.

19      Q.  Do you know that anyone ever questioned

20   Purim's rights fought Material Girl license?

21      A.  I did.

22      Q.  And L.A. Triumph has too, right?

23      A.  They probably have.

24      Q.  Anybody besides you and L.A. Triumph

25   has ever questioned Purim's rights to the

                       155

1    them and now we haven't developed any new rights.

2    That's consistent.  One doesn't necessarily lead

3    to the other but it's consistent.

4        Q.  And this is your interpretation of the

5    contracts, correct?

6        A.  Which contracts?

7        Q.  The Purim licensing agreement and the

8    other contracts that you looked at, the Boy Toy

9    and back tee touring contracts?

10       A.  Well not just those.  My foundation is

11   all of the things I've considered, not just those

12   contracts.  But yes, you are right.  Those

13   contracts are part of it but they are not

14   everything.

15       Q.  Now the next sentence in this opinion

16   is viewing the license under trademark licensing

17   business standards, Purim has no trademark

18   interest in Material Girl to license."  That's

19   your conclusion and opinion, right?

20       A.  Correct.

21       Q.  Now, tell me what the trademark

22   licensing business standards are that you are

23   referring to.  Are they written anywhere?

24       A.  No, they are not written in I where,

25   know.

164

1      Q.  Are they explicitly oral anywhere?

2      A.  What do you mean by that?

3      Q.  Have you ever had somebody say to you

4    these are the trademarks licensing business

5    standards?

6      A.  No.  As in all businesses, if you work

7    in the business for a while you learn certain

8    common usages, certain standards of practice.  It

9    happens in all businesses.  They are generally

10   not written down.  They may change and E evolve

11   over time and you only develop an understanding

12   of those when you have some years of experience

13   in a business.  And that applies to automobile

14   parts, airplane business.  It applies to all

15   businesses.

16          And in this particular business you

17   look at some of the things that I looked at and

18   you are able to reach conclusions.  And sometimes

19   you get helped out tremendously.

20     Q.  The next opinion you are giving, item 5

21   in your report is that the license of Material

22   Girl between Purim and MG Icon is a naked license

23   because Purim fails to exercise quality control.

24          Why is it your opinion that Purim has

25   failed to exercise quality control?

165

1    It being L.A. Triumph has also sold Material Girl

2    apparel to Ross stores.  These combined sales

3    exceed $2 million during the last nine years.  Do

4    you see that?

5    A.  I do.

6    Q.  And that's true, right?

7    A.  Yes.

8    Q.  Except those $2 million are in 2002 and

9    2003, right?

10    A.  Most of it's then, right.

11    Q.  Why did you say over the last nine

12    years?

13    A.  That's also true.  Why not.  It's true.

14    Q.  Because you wanted to imply there was a

15    continuous use over the nine years, right?

16    A.  Not at all, not my your you in the

17    case.

18    MR. VAKIL:  Objection, misstates the

19    nature of the evidence.

20    Q.  And then you say L.A. Triumph sells its

21    Material Girl line in the same apparel market

22    segment as Macy's.  You explained that to me

23    before, right?

24    A.  I did.

25    Q.  But it's also true that L.A. Triumph

188

1   has not sold its Material Girl line in the same

2   apparel market segment as Macy's over the last

3   five years since 2005, correct?

4       A.  I don't recall the invoices in that

5   time period.

6       Q.  Because you wanted the more current

7   invoices and there weren't any, right?

8       MR. VAKIL:  Objection, mistakes the

9   evidence, mischaracterizes the testimony.

10      Q.  Do you have any evidence or any

11  knowledge that L.A. Triumph since 2005 has been

12  selling its Material Girl line in the same

13  apparel market segment as Macy's?

14      A.  Not that I recall.

15      Q.  And why do you think that is?

16      A.  I don't know.

17      Q.  Haven't you asked why that is?

18      A.  No.

19      Q.  You're not curious as to why L.A.

20  Triumph has not been selling its term girl line

21  very much since 2005?

22      MR. VAKIL:  Same objections.

23      THE WITNESS:  I'm curious about many

24  things.  Aps I mentioned earlier, while one can

25  be curious one has to limit the scope of one's

189

1    work.  And what I was trying to do was to

2    determine if L.A. Triumph had significant sales

3    into the same market segment as Macy's.

4        Q.  And you did that, right?

5        A.  And I did that.

6        Q.  And your conclusion was that it does,

7    right?

8        A.  That's right.

9        Q.  And that conclusion was based on the

10   sales that were from 2002 and 2003, correct?

11       A.  That's right, yes.

12       Q.  And to reach that conclusion you did

13   not try to find out if that was still true today,

14   right?

15       A.  Well, that's not fair because I asked

16   for all the invoices.  So I got information on

17   more recent sales.  So the problem with your

18   question is it presupposes I din't care.  I asked

19   for the information and analyzed what I had.

20       Q.  And the answer is that you couldn't do

21   that comparison currently because there aren't

22   any sales to compare it to, right?

23       A.  No.  We've been through this a couple

24   of times.

25       Q.  Now, the next conclusion is that the

190

1     A.  Wrong.

2     Q.  So your knowledge is that there's been

3     very little sales by L.A. Triumph of Material

4     Girl from 2005 to date?

5     A.  You know that's not right either.

6     Q.  What's not right about that?

7     A.  I didn't total up those sales, okay.

8     Q.  Because you were interested in the 2002

9     to 2003 period and not the current five year

10    period.  You can't interrupt me?

11    A.  I did a quick survey, a quick look at

12    the invoices and decided to focus on a particular

13    time period.  I didn't total the invoices in the

14    other time period.  So you are assuming that I

15    totalled them and said they are this or this or

16    this in 2005, 6, 7, 8.  I didn't do that

17    exercise.

18    Q.  But if you are comparing the Macy's and

19    L.A. Triumph Material Girl market segments, you

20    have to admit that it is more appropriate to

21    compare the same years, apples to apples than to

22    compare sales from Macy's in 2010 to L.A. Triumph

23    sales in 2002 and 2003.  You will give me that,

24    right?

25    A.  I'll give you that, sure.

                              201

1      Q.  And the reason that you did not do

2    that, compare compare an sales and compare an

3    time periods is because you had no sales invoices

4    from L.A. Triumph to do that, right?

5      A.  No, we've been through that about four

6    times.  I said I didn't total other time periods.

7    I didn't even determine whether there were or

8    weren't in other time periods.  I looked at the

9    invoices I had and decided to select this time

10    period.  And I was trying to make a determination

11    whether L.A. Triumph had significant sales in the

12    same market segment.  And in this time period it

13    did and that's my opinion.

14      Q.  All right.  So then what happened was

15    when you looked at 2008, 2009, 2010, the invoices

16    were not significant enough from L.A. Triumph for

17    you to have the foundation to make that

18    comparison, correct?

19      A.  That's part of it, sure.

20      Q.  Based on your experience, if somebody

21    goes to Ross stores and buys Material Girl

22    products, are they associating those Material

23    Girl products with L.A. Triumph?

24      A.  I didn't do any research into that.  I

25    haven't done any surveys.  I haven't interviewed

202